UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  11-20492-CR-SEITZ/SIMONTON

UNITED STATES OF AMERICA,

     Plaintiff,

v.

ANTUAN FONTANE-MEDINA, et al,

     Defendants.

_____/

REPORT AND RECOMMENDATION RE:
DEFENDANT FONTANE-MEDINA'S
MOTION TO SUPPRESS STATEMENTS

     Presently pending before this Court are Defendant Fontane-Medina's Motion to Suppress (DE # 58) and Defendant Alvarez-Zerquera's Motion to Suppress (DE # 59).  The Honorable Patricia A. Seitz, United States District Judge, has referred this matter to the undersigned United States Magistrate Judge (DE ## 60, 62).  The government has responded in opposition (DE ## 67, 68).  Defendant Fontane-Medina filed a Motion to Adopt (DE # 64) Defendant Alvarez-Zerquera's argument based on delay in presentment, which the District Judge granted (DE # 66).  An evidentiary hearing on the motion was held on October 14th, 18th, and 19th, 2011[1].  The parties filed supplemental memoranda regarding the issue of the burden of proof (DE ## 76, 79).  Thereafter, the charges were dismissed against Defendant Alvarez-Zerquera, and therefore his motion is moot (DE # 95).  For the reasons stated below, the undersigned Magistrate Judge **RECOMMENDS** that the Motion filed by Defendant Fontane-Medina be **DENIED**.

     In sum, the undersigned finds that the Defendant was not in custody when

_____

[1]  The transcripts of the hearing are contained in DE ## 88, 90 and 94)

questioned by the U.S. Coast Guard while on board the vessel Nautigal, and therefore no *Miranda* warnings were required prior to the questioning, and  those statements should not be suppressed.  In addition, although it is a close question,  the undersigned finds that the delay in presentment to a United States Magistrate Judge was not for the purpose of obtaining incriminating statements and was reasonable under the circumstances of this case, and therefore the statements made by Defendant Fontane-Medina to Homeland Security Investigations Special Agent Nader should not be suppressed.

### I.    BACKGROUND

Defendant Fontane-Medina and co-defendants Alvarez-Zerquera and Mirabel-Sainz[2] were charged in a five-count Indictment with conspiracy to encourage the unlawful entry of an alien into the United States, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iv) and 1324(a)(1)(A)(v)(I) in Count 1; knowingly encouraging the illegal entry of an alien into the United States, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) as to alien Oriol Rodriguez-Diaz in Count 2, and alien Andrea Crespo-Diaz in Count 3; and knowingly attempting to bring an alien into the United States unlawfully and for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii) as to alien Oriol Rodriguez-Diaz in Count 4, and alien Andrea Crespo-Diaz in Count 5 (DE # 19).

The Defendants were interdicted in international waters traveling west on a vessel named *Nautigal* by the U.S. Coast Guard Cutter Sitkinak ("USCGC Sitkinak"),

---

[2]  Defendant Mirabel-Sainz has entered a guilty plea.

2

approximately eighteen nautical miles southeast of Miami, Florida (DE ## 58, 67).  There were five individuals onboard the *Nautigal* at the time of interdiction, Defendant Fontane-Medina and co-defendants Yosniel Mirabel-Sainz and Alvarez-Zerquera,  and aliens Rodriguez-Diaz and Crespo-Diaz (DE ## 67, 19).

II.     THE MOTION TO SUPPRESS

Defendant Fontane-Medina seeks suppression of statements he made and fruits thereof.  Specifically, he seeks to suppress certain statements he made to the Coast Guard while on board the Nautigal, and thereafter on the Coast Guard cutters to which he was transferred;  the statements made to Customs and Border Patrol ("CBP") Officer Miguel Ulloa following Fontane-Medina's arrival at the CBP offices in Miami, including those written on Form I-877, Record of Sworn Statement in Administrative Proceedings (GX A); and, the statements made to Special Agent Alexander Nader of Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI").

During the evidentiary hearing, the Government stated that it did not intend to introduce into evidence any statements made by the Defendant while on board the Coast Guard cutters or to CBP Officer Ulloa during the administrative interview (DE # 94 at 100).   Therefore, the only statements at issue in the pending motions are those made on board the Nautigal after the Coast Guard boarded the Nautigal, and those made to HSI Special Agent Nader.

Defendant Fontane-Medina filed his own Motion to Suppress (DE #58) and also adopted the Motion to Suppress file by co-Defendant Alvarez-Zerquera (DE ## 59, 64, 66). The Defendant does not seek to suppress any statements made during the initial phase of questioning by the Coast Guard after the Nautigal was boarded, which lasted

3

approximately 15 to 20 minutes.  He contends, however, that after this initial questioning, and after the Coast Guard received information from the El Paso Intelligence Center which reflected that the three defendants were lawful permanent residents, but that the two others had no lawful status in the United States,  he was in custody on board the Nautigal, that he was not advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and therefore any statements he  made to U.S. Coast Guard Officers after the initial questioning must be suppressed.[3]  With respect to the statements made to ICE Special Agent Nader, the Defendant contends that they were made more than six hours after his arrest, that there was an unreasonable delay in his presentment to a United States Magistrate Judge following his arrest, in violation of 18 U.S.C. §3501(c); and, therefore, suppression of these statements is required.[4]

Specifically, the Defendant alleges that he was arrested by Coast Guard Officers on the evening of July 10, 2011 and remained in Coast Guard custody for thirty hours (DE # 59 at 3).  Upon return to shore, the Defendant was transferred to CBP custody, and did not appear before a magistrate judge until the afternoon of July 13, 2011 (DE # 59 at 4).  The Defendant argues that the delay of approximately 51 hours from the time of arrest to his appearance before a Magistrate was unreasonable and unnecessary, since he was arrested 18-20 miles offshore, and the extended delay was not justified by considering either the means of transportation or distance involved in travel to the

---

[3]  Counsel for Defendant Fontane-Medina clarified his position in this regard during his oral argument on October 14, 2011 (DE # 88 at 266), and October 19, 2011 (DE # 94 at 64).

[4]  The Defendant acknowledges that these statements were made after the Defendant was advised of his *Miranda* rights and waived those rights, and he does not challenge the voluntariness of those statements (DE # 88 at 268-69).

4

nearest Magistrate (DE # 59 at 3-4)[5].  As a result, the Defendant maintains that his statements should be suppressed.

In its response (DE # 68), the Government contends that the Defendant misconstrues the factual record and the cases he relies on for support.  The Government argues that *Miranda* was not triggered when the Defendant was questioned by the U.S. Coast Guard and CBP agents because the questions were administrative in nature (DE # 68 at 14).  In addition, the Government maintains that routine questioning of this type does not constitute "interrogation" for purposes of *Miranda*, because the officers did not intend to elicit incriminating responses (DE # 68 at 14).  The Government also challenges the Defendant's assertion that he was "in custody," arguing that he was not arrested, but merely detained while the law enforcement agencies determined his immigration status (DE # 68 at 9, 11), and he was not handcuffed (DE # 68 at 12).

Furthermore, the Government argues that it was neither practical nor feasible for the Coast Guard or CBP to take the Defendant before a magistrate judge any sooner than he was, because of the delays inherent in capturing individuals outside the United States, and coordinating an interagency cooperative investigative effort (DE # 68 at 12). Additionally, the government maintains that suppression of the Defendant's statements is not warranted because the delay between the time of the Defendant's detention and his presentment before a Magistrate Judge was not for the purpose of eliciting incriminating statements, but was due rather to practical logistical reasons (DE # 68 at

---

[5]  It is unclear how the 51-hour delay alleged in the Motion was calculated since the time from the initial boarding at 8:00 p.m. on July 10, 2011, until the initial appearance at 1:30p.m. on July 13, 2011, is 65.5 hours; or, if the trigger is the point of transfer to the Coast Guard cutter Sitkinak, 62 hours elapsed.  It is unnecessary to resolve this issue, however, since the analysis below is based upon the times established at the evidentiary hearing.

12).  Therefore, the Government contends that neither the statements made on board the Nautigal nor the statements made to ICE Special Agent Nader should be suppressed.

III.   **FINDINGS OF FACT**

At the evidentiary hearing, the government presented the testimony of Pedro Rondon, David Cordero, Miguel Ulloa, Alexander Nader, Enrique Morales, Robert Landolfi, Stephen Chamberlin, and Bruce Boswell.  The Defendant did not call any witnesses at the hearing.  In addition to the testimony, the Court admitted into evidence Government exhibits A through I, and Defense Exhibits 1 through 7.[6]

Based upon the totality of the evidence presented at the hearing, and the demeanor of the witnesses, the undersigned Magistrate Judge finds that the testimony of  the Government's witnesses was credible.  Their testimony was forthright, internally consistent, and generally consistent with each other and the exhibits, including contemporaneous email correspondence and the Coast Guard log of events, which is referred to as a MISLE Report.[7]  The MISLE Report is prepared by the Coast Guard Command Center in Miami, based upon information received from, *inter alia*, Coast Guard cutters that relay information from a boarding team (DE # 88 at 76-77).

Based upon the testimony, and the exhibits introduced at the hearing, the undersigned makes the following findings of fact.

_____

[6] In this Report and Recommendation, the Government's exhibits are designated by the symbol "GX," and the Defendant's exhibits are designated by the symbol "DX."

[7] There are minor discrepancies between the times recorded in the MISLE Report, which contains information entered after it is transmitted by those officers directly involved in the boarding and investigation, and the times to which the officers testified; however, those discrepancies do not affect the outcome of this case.

A.      Procedures Regarding the Interdiction of Aliens on the High Seas

1.  To put into context the activities of the United States Coast Guard in the case at bar, the Government presented the testimony of Commander Robert Landolfi, who is presently the commanding officer of the Coast Guard Tactical Law Enforcement Team ("TACLET") in Miami (DE # 90 at 5).  In July 2011, Commander Landolfi was the section chief responsible for international and interagency liaison for Coast Guard District 7, which is the operations center that coordinates all Coast Guard operations from South Carolina through South America, including the Caribbean (DE # 90 a 6).  The operations center is responsible for assuring that the proper procedures are followed by Coast Guard personnel conducting operations on the high seas (DE # 90 at 10).

2.  When a vessel suspected of alien smuggling is stopped by a Coast Guard cutter on the high seas, a boarding team is sent on a small vessel from the cutter to the vessel that has been stopped.  The boarding team goes on board the subject vessel and obtains identification documents from the persons on board.  In addition, an initial safety inspection is conducted to ensure that there is no flooding or other dangerous condition on the vessel, and that it is safe to be on board.  After that, there is an inspection for safety equipment like life jackets, flares, and fire extinguishers.  While the inspection is occurring, the information regarding the persons on board is sent to the Coast Guard cutter, which then transmits that information to the District 7 command center in Miami so that the names and the vessel can be checked against law enforcement databases to determine if the identification is valid, and that the vessel is properly registered and not stolen (DE # 90 at 12-13).  Sometimes biometrics are performed on the persons stopped to verify their identity.  This is a process under which fingerprints are taken and then uploaded into a system which checks to see if the

7

fingerprints match anyone who is on a criminal, terrorist or migrant smuggling lookout, and also whether they match any persons who are in the U.S.-Visit system which identifies persons who have previously entered the United States, or have applied for a visa to enter the United States, or who have applied for any immigration benefits (DE # 90 at 16).

3.  If a vessel is stopped and there is no suspicion of illegal activity based upon the administrative part of the boarding procedure and checking the information provided by the persons on board, the vessel and the persons on board are permitted to go on their way (DE # 90 at 82).

4.  The operations center keeps an electronic log of the information it receives from the cutter (DE # 90 at 13).  This log is referred to as the Marine Information for Safety and Law Enforcement, and is known as a MISLE report (DE # 90 at 28).[8]

5.  If there is a potential smuggling case, the results of the biometrics are forwarded to members of the Regional Concurrence Team ("RCT"), which is a group of persons from various federal agencies who coordinate interagency decision-making and the disposition of law enforcement cases (DE # 90 at 22).  Approximately 14 to 15 persons participate in an RCT call, depending on the situation (DE # 90 at 24).  The purpose of the RCT is provide all of the various agencies that have a role in an interdiction with the same information at the same time so that they can work together to determine the appropriate way for the matter to proceed (DE # 90 at 117-18).  If the result

---

[8]  The MISLE report in the case at bar was created by Commander Lopez, who was unavailable to testify at the suppression hearing since he was in San Diego on vacation (DE # 90 at 31).  Based upon his experience, Commander Landolfi testified concerning the interpretation of terminology used in the MISLE report (DE# 90 at 30). The MISLE report generated with respect to the case at bar is contained in DE # 67-1, and was admitted into evidence as DX 6.

of the RCT call is to bring the subjects ashore, the Coast Guard turns them over to Customs and Border Protection officers when they arrive (DE # 90 at 27-28).

### B.   The Interdiction of the Nautigal by the Coast Guard Cutter Sitkinak

6.  At all relevant times, Commander Stephen Chamberlin was Chief of Response Operations for Coast Guard Sector Miami, and as such he was in charge of all Coast Guard operations from Caesar's Creek (south of Miami) to Sebastian Inlet (just north of Port St. Lucie and Ft. Pierce) (DE # 90 at 86, 89).  His duties involved oversight and the creation of schedules for the seven patrol boats  that were based in Miami DE # 90 at 88-89).

7.  The Coast Guard cutter Sitkinak is a 110-foot vessel, with 16 crewmen (DE # 88 at 21).  On Sunday, July 10, 2011, the Sitkinak was patrolling the Florida Straits between Bimini in the Bahamas, and South Florida (DE #88 at 9).  At that time, the Sitkinak was limited to conducting day trips on patrol since its refrigeration system was not working (DE # 90 at 93).

8.  At approximately 8:00 p.m. that evening, as it was returning back to the base after its day on patrol, the Sitkinak encountered the vessel Nautigal approximately 18 to 20 miles east of Miami, traveling eastward (DE # 88 at 35, 65; DE # 90 at 95;  DX 1).  The Nautigal is a United States documented vessel (DX 6 at 82, entry at 110050ZJUL11).  The seas were calm, and the visibility was good (DE # 88 at 38).  Under the sea and weather conditions at the time, this location was about 30 or 45 minutes away from the Coast Guard station in Miami (DE # 90 at 61).  The Coast Guard attempted unsuccessfully to contact the Nautigal by radio, and then stopped the Nautigal for the purpose of conducting a Coast Guard safety inspection.

9.  Officer Pedro Rondon is employed by the United States Coast Guard, and at all

relevant times served on the U.S. Coast Guard Cutter Sitkinak as a boarding officer  (DE # 88 at 7).  Officer Rondon served as the boarding officer for the Nautigal (DE #88 at 9-10).

10.  Officer Rondon is bilingual, and was the only member of the three-person boarding party who spoke Spanish (DE # 88 at 10, 21).  Before boarding the Nautigal, he introduced himself as Officer Rondon with the U.S. Coast Guard, and asked if there were any weapons on board.[9]  Thereafter, Officer Rondon and the two others members of the boarding team boarded the Nautigal.[10]  While the other members of the team conducted the safety inspection to make sure that the Nautigal was safe for them to be on board, Officer Rondon requested identification documents from the five persons on the Nautigal.  He obtained identification from Antuan Fontane-Medina, Villiers Alvarez-Zerquera, and Yosniel Mirabel-Sainz (DE #88 at 10).  The other two persons on board, later identified as Oriol Rodriguez-Diaz and Andrea Crespo-Diaz, claimed that they had left their identification documents in their car (DE #88 at 10).

11.  While the safety inspection was conducted, nobody was arrested, placed in handcuffs, or confined.  They were free to move about the vessel, and, in fact one person who felt seasick went alone below the deck into the stateroom to lay down in the bed (DE # 88 at 11, 18).  Officer Rondon spoke in a normal tone of voice (DE # 88 at 11).  All questioning occurred during the first fifteen or twenty minutes of the boarding, while the safety inspection was being conducted (DE # 88 at 14,  24).  When Officer Rondon first

---

[9]  The record does not reflect any statements made by any of the persons on board the Nautigal before the boarding.

[10]  Photographs of the Nautigal were admitted into evidence as Defense Exhibits 2, 3, 4 and 5 (DE # 88 at 49-50).

boarded the vessel, he asked who was the operator of the vessel, and Yosniel Mirabal-Sainz responded that he was (DE # 88 at 26).  Mr. Mirabel-Sainz provided  the name and phone number of the owner of the vessel, who was not on board (DE # 88 at 25).  Mr. Mirabal-Sainz stated that he worked for the owner, cleaning and performing maintenance on the vessel, and that he had borrowed the boat (DE # 88 at 26).[11]

12.  During the course of the boarding, Officer Rondon asked for identification from all persons on board (DE # 88 at 11-12, 17, 27).  Mr. Fontane-Medina was asked for identification, the purpose of the voyage, and the relationship between him and the owner of the vessel and the two persons who did not have identification documents (DE # 88 at 11-12).[12]  The safety inspection lasted between 15 and 20 minutes (DE # 88 at 14).

13.  The boarding party remained on board the Nautigal for approximately two-and-a-half hours after the completion of the safety inspection (DE # 88 at 19, 22-23). Based upon the information provided by the persons on board the Nautigal, a records

---

[11]  The Coast Guard MISLE Report (DX 6) first reflects the name of the owner of the vessel at 8:50 p.m., but Officer Rondon explained credibly that he asked for this information during the initial boarding questions, and that he did not control when that information was communicated to the person who was entering it into the MISLE report (DE # 88 at 29-30).  The MISLE Report also reflects that the owner was contacted at approximately 10:10 p.m. on July 10, 2011, and stated that he knew Antuan Fontane-Medina, but had not given Fontane-Medina permission to use the boat DX 6 at 83, entry 110210ZJul11).  The times reflected in the MISLE report are Zulu time, which is 4 hours after local time in Miami (DE # 88 at 53, 55).  In this Report and Recommendation, local Miami time is used.  The undersigned recognizes that there is a discrepancy between the statement of the owner regarding the person who performed maintenance on the vessel, and the statement attributed to Mr. Mirabel-Sainz that he performed maintenance on the vessel; but this discrepancy is not relevant to the issues presented in the Motion to Suppress.

[12]  Officer Rondon testified that he questioned the persons on board the Nautigal as a group, and he had no specific recollection of the answers given by Mr. Fontane-Medina (DE # 88 at 46-48).  He later testified that all five persons on board said they had left from Bayside in Miami and traveled to Bimini, and were returning back to Miami (DE # 88 at 59-60).

check  was conducted by the El Paso Intelligence Center ("EPIC")  to confirm their identity and status (DE # 88 at 60-61).  According to the MISLE report, at 9:05 p.m., EPIC requested that CBP be contacted for further information because Yosniel Mirabal and Antoine Fontane were on the National Immigration Lookout List (DE # 90 at 33, DX 6 at 83).  At 9:14 p.m., the information reported was slightly different, reflecting that the two persons who did not have identification had no status to enter the United States, and that one of the remaining three persons was on the Immigration Lookout List (DE # 90 at 34, DX 6 at 83).  Shortly after 10:00 p.m., Officer Rondon received information from the Command Center on the Sitkinak that the three persons who produced identification were lawful permanent residents, but that the other two were not on the permanent resident list (DE # 88 at 31-32)[13].

14.   The MISLE report makes it clear that by 10:11 p.m., there was a criminal investigation regarding alien smuggling (DE # 90 at 57, DX 6 at 83).  At approximately 10:22 p.m., Robert Hammer, an ICE supervisor requested that biometrics be conducted on all five of the persons on board the Nautigal; and, at 10:22 p.m., he sent an email with respect to bringing the Nautigal  to Miami (DE # 90 at 58, DX 6 at 84).

15.   Thereafter, by approximately 11:30 p.m., the persons on the Nautigal were transferred to the Coast Guard cutter Sitkinak (DE # 88 at 19, 22-23, 55-56, DX 6 at 85).  Two members of the Coast Guard remained on board the Nautigal (DE # 88 at 39-40).

16.   While on board the Sitkinak, neither Defendant Fontane-Medina nor the others from the Nautigal were placed under arrest or handcuffed, and they were permitted to

---

[13]  Although It appears from the MISLE report that this information was obtained by the Coast Guard at approximately 9:00 p.m., Officer Rondon was not notified until later (DE # 62-63)

use the restroom, and have water.  They were kept in a catwalk area around the bridge, and the three people with identification (Fontane-Medina, Alvarez-Zerquera, and Mirabel-Sainz) were kept together, but separated from the two people who did not have identification (Rodriguez-Diaz and Crespo-Diaz) (DE # 88 at 20).  They were given blankets and a place to sleep (DE # 88 at 42-43).  According to the testimony of Officer Rondon, nobody was questioned while on the Sitkinak (DE # 88 at 20).

17.  According to the MISLE report, at approximately 11:45 p.m., the Sitkinak reported that Cuban cedulas were found for Orio Rodriguez Diaz and Andrea Crespo Diaz (DE # 90 at 36).  Although they initially maintained that they were lawful permanent residents of the United States, thereafter, at 1:22 a.m. on July 11, 2011, these two persons admitted that they were Cuban migrants (DE # 90 at 43 , DX 6 at 86).  A later entry in the MISLE report, at 1:55 a.m., states that the male migrant refused to talk, but the female migrant stated that they had been at a resort in Bimini for three days, and had then met the three men on the Nautigal, who were paid $500 to transport them to the United States (DX 6 at 87).

18.  At approximately 1:25 a.m. on July 11th, the Sitkinak was given permission to conduct biometrics testing of all five persons from the Nautigal (DE # 90 at 63-64; DX 6 at 86)[14].  Officer Rondon conducted the biometrics testing, which consisted of taking fingerprints, which were then entered into the system to confirm identity (DE # 88 at 43, 75-76).

19.  At 2:20 a.m., a summary of the investigation was transmitted to law enforcement personnel, including members of the RCT (DE # 90 at 46; DX 6 at 87).  At

---

[14]  Two entries on the MISLE report reflect this permission–the first is at 1:26 a.m., and the second entry is at 2:00 a.m. (DE # 90 at 45, 63-64; DX 6 at 86-87).

3:35 a.m. on July 11th, the biometrics results were received by the Coast Guard, which reflected that there was no derogatory information with respect to the three lawful permanent residents (DE # 90 at 48, DX 6 at 88).

20. Commander Chamberlin authorized the Drummond to relieve the Sitkinak the following morning due to the crew fatigue of the Sitkinak crew, and the fact that the Sitkinak was due to begin a maintenance cycle that day in which the refrigeration problem could be addressed (DE # 90 at 98). The Coast Guard had not yet been authorized to bring to Miami the persons who had been on board the Nautigal, and therefore Commander Chamberlin ordered them to be transferred to the Drummond (DE # 90 at 99). Under the previously discussed policies, unless there is a life-threatening emergency, the Coast Guard was required to wait for the outcome of the RCT conference call before bringing anyone to shore (DE # 90 at 51, 101, 118).

21. At approximately 8:00 a.m. on July 11, 2011, all five persons who had been on board the Nautigal were transferred from the Sitkinak to another Coast Guard Cutter, the Drummond, and the Sitkinak then returned to its Miami base (DE # 88 at 43-44, 68, DX 6 at 89). According to the interagency procedures, the five persons from the Nautigal could not be brought to the United States yet because there had not been an RCT conference call to determine the appropriate disposition (DE # 90 at 51). Commander Chamberlin ordered the Drummond to move closer to shore, however, so that he would have the ability to rapidly move the persons to shore if he received permission to do so (DE # 90 at 101). Therefore, the Drummond moved to about ten miles offshore from Government Cut, which is where the base is located (DE # 90 at 101).

22. The Nautigal had been manned by a crew from the Sitkinak throughout the night; and, in the morning a crew from the Drummond relieved them (DE # 90 at 106).

14

The Nautigal was then brought back to Miami that morning because it was running out of fuel (DE # 90 at 106, 109).

C.    <u>The Determination of Further Proceedings Regarding the Aliens</u>

23.  At 10:20 a.m. on July 11th, the District 7 command center established that the RCT conference call would occur at 1:00 p.m. (DE # 90 at 51).  Prior to the RCT conference call, at approximately 10:30 a.m., CBP Chief Bruce Boswell was consulted regarding the availability of his resources to process the persons on the Nautigal (DE # 90 at 119-20; DE # 94 at 6).  Chief Boswell was responsible for passenger operations at the Port of Miami (DE # 90 at 113).  As such, he oversaw approximately 120 officers who were responsible for processing persons who arrived on cruise ships, private vessels or through Coast Guard interdictions at sea, as well as inspecting cargo vessels (DE # 90 at 113).  More than 2 ½ million passengers are processed annually at the seaport (DE # 90 at 114).  Based on the arrival times of regularly scheduled passengers, the majority of the officers, approximately 80 to 85, work a shift from 6:00 a.m. to 2:00 p.m., with a high concentration on Friday, Saturday, Sunday, and Monday (DE # 90 at 114-15).  To cover the seven-day workweek, approximately 14 officers cover a shift from 2:00 p.m. to 10:00 p.m., and three people are assigned to work between 10:00 p.m. and 6:00 a.m. (DE # 90 at 115, 125).

24.  On Monday, July 11, 2011, four cruise ships arrived at the Port of Miami with passengers to be processed by CBP (DE # 94 at 21-22).  The majority of the CBP officers working the Port of Miami that day were involved with the cruise ships from the time the ships arrived at approximately 6:00 a.m., until they departed between 4:30 and 5:00 p.m. (DE # 94 at 22).  In addition to processing cruise ship passengers, the officers had cargo vessel inspections, radio monitoring duties, and other tasks to perform (DE # 94 at 22-

15

23).  There were ten officers assigned that day to the 2:00 p.m. to 10:00 p.m. shift, whose duties primarily consisted of conducting boardings of cargo ships, handling radio calls, and manning the front desk (DE # 94 at 23-24).  There were two officers working the 10:00 p.m. to 6:00 a.m. shift that day (DE # 94 at 25).

25.  On Tuesday, July 12, 2011, there were no cruise ships in port, and there were approximately 60 or 70 officers working the 6:00 a.m. to 2:00 p.m. shift (DE # 94 at 26).  Of these, there were approximately 15 available to handle administrative case processing (DE # 94 at 26-27).

26.  Chief Boswell advised the CBP representative to the RCT that he recommended the persons on boards the Nautigal be processed by CBP at 7:00 a.m. the following morning, July 13th (DE # 94 at 7).  This recommendation was based on his experience that there was sufficient information to warrant administrative charges of alien smuggling, but not criminal charges (DE # 90 at 8).  If an individual is charged administratively, they are processed in immigration proceedings and go before an immigration judge for ultimate disposition (DE # 94 at 9).  Chief Boswell made his recommendation to bring them in for administrative processing, which is a lengthy process that can be performed by a limited number of his officers (DE # 94 at 10).  Chief Boswell sent his recommendation to the RCT representative, Jack Garofano at 11:40 a.m. in an email, which stated:

> If no charges are being placed . . . any time before 9pm would be sufficient to inspect and admit them as returning LPR's.  If there is a suspicion of Alien Smuggling and charges (administrative) are to be considered then it would be better to have them in at 0700 tomorrow.  If subjects are going to be charged criminally (I doubt it) and taken away by ICE/HIS then any time before 7pm tonight would be okay.

(GX G; DE # 94 at 11-12).

16

27.  Chief Boswell explained that under the first option, if there was no suspicion of alien smuggling, the persons could have been processed for admission in about 30 minutes, or less (DE # 94 at 13-14).  If there was sufficient information to proceed with criminal charges, and the U.S. Attorney's Office had accepted the case for prosecution, the administrative processing requirements would have been postponed, and the subjects would have been turned over to ICE agents as soon as CBP conducted a cursory review of documentation and verified identity; and therefore any time before 7:00 p.m. would give sufficient time (DE # 94 at 14-15, 30-31).  In this case, there had been no determination made with respect to a criminal prosecution, and so Chief Boswell's recommendation that the persons be brought to CBP the following morning was based on his need for sufficient time and resources to conduct the full administrative processing (DE # 94 at 15-16).

27.  The administrative process, as described Chief Boswell, is as follows:

> From the initial acceptance of them from Coast Guard and getting them to my office, there is a search process. There's what's called a biometric enrollment process where you take their fingerprints ands their photographs and you compare that to any of the databases that we have accessible to us for past criminal histories or to confirm that they are known to the Government, in this case, that they were legal permanent residents and that would have been brought up.

> In addition to that, then we would take sworn administrative statements from them on the facts as they relayed them to us on where they were at, how they were encountered, what they were in the process of doing, what their nationality is, the history of their family, to give the basis of what their rightful right in the U.S. is.

> There is a number of charging documents that we would place on them. We have to inventory their possessions, provide them documentation on legal rights and counsel that's available to them.

> We need to feed them.  We need to ensure that their
> medical health is taken care of.  There's a litany of things that
> are done for our processes to be complete.
>
> And then once our process is complete and only once it
> is 100 percent complete, then we have to seek determination of
> what to do with them with our partners of detention and
> removal because now that they have been found inadmissible
> into the United States, they could go into the custody of our
> detention and removal process and have an appearance
> through that with immigration judges to make a final
> determination on deportability and other issues.
>
> With that, that in itself can take upwards of three to five
> hours to find out whether or not detention and removal will
> actually take custody of the subjects from us, and, if so, where
> we are then to transport them and turn them over to the
> custody of D & R.

DE # 94 at 15-16) Chief Boswell estimated that the average amount of time it takes from

the time CBP receives aliens at the dock from the U.S. Coast Guard until they are lodged

in a detention and removal facility is no less than 12 hours, and sometimes as long as 16

hours (DE # 94 at 17).

28.  The conference call occurred as scheduled, with representatives attending

from the Coast Guard, the U.S. Attorney's Office, Immigration and Customs

Enforcement, Homeland Security Investigations and Customs and Border Patrol (DE # 90

at 53).  The RCT determined that the three lawful permanent residents–Fontane-Medina,

Alvarez-Zerquera, and Mirabel-Sainz– would be brought to the Coast Guard base at 7:00

a.m. the following morning, and that the two persons with Cuban cedulas would be

processed for repatriation (DE # 90 at 53).

29.  At about 6:30 a.m. on July 12th, Fontane-Medina, Alvarez-Zerquera, and

Mirabel-Sainz were transported from the Drummond to shore on a 45-foot Coast Guard

patrol boat that was dispatched from the Coast Guard station in Miami (DE # 90 at 102;

DX 6 at 93).  The process of transferring the three defendants from the Drummond to the smaller patrol boat and bringing them to Miami took approximately an hour (DE # 90 at 110).  The two Cuban citizens remained on the Drummond, and were repatriated to the Bahamas several days later (DE # 90 at 102).

**D.**   **The Transfer of Fontane-Medina, Alvarez-Zerquera, and Mirabel-Sainz to CBP Custody, and the Ensuing Activities of CBP Officers**

30.  Fontane-Medina, Alvarez-Zerquera, and Mirabel-Sainz arrived at the Coast Guard station in Miami at approximately at 7:00 a.m., and the Coast Guard gave custody of them to CBP officers (DE # 90 at 55, DX 6 at 93).

31.  At all relevant times, Officer David Cordero and Officer Miguel Ulloa were employed by the Department of Homeland Security, Customs and Border Protection ("CBP") at the port of Miami.  Their duties included processing aliens or passengers that arrive in the United States, and included checking documents and completing checks of systems of records to determine whether the person had previous encounters with government agencies, whether there were any outstanding warrants, whether the documents presented by the person match the information contained in the systems, and conducting interviews to determine if the person is admissible into the United States (DE # 88 at 85-86, 142-47).  The CBP Officers have law enforcement authority, but their job duties do not include processing persons with respect to criminal charges; if criminal charges are going to be brought, the person is detained until an immigration enforcement officer arrives to take over the matter (DE # 88 at 133-34).

32.  On July 12, 2011, Officer Cordero was working the 6:00 a.m. to 2:00 p.m. shift at the port.  Early that morning, he was contacted by his supervisor, who told him that the Coast Guard had intercepted a vessel, and who instructed him to go to the Coast

Guard station in Miami Beach to pick up the people on the vessel and bring them to the CBP office (DE # 88 at 87, 104-06).  Officer Cordero and his partner, as well as another two-person unit went to the Coast Guard station, where they assumed custody of the three persons at about 7:00 a.m. (DE # 88 at 87-88, 118).

33.   Fontane-Medina, Alvarez-Medina, and Mirabel-Sainz were handcuffed and frisked by the CBP officers, placed in a CBP car, and were driven a short distance to the main CBP office at the seaport (DE # 88 at 88-90).  When they arrived at the CBP office, they were put in a holding cell (DE # 88 at 88-90).  The holding cell is a regular room with benches (DE # 88 at 91).  The doors to the cell were kept open, with an officer outside the door (DE # 88 at 91-92).

34.   As described in more detail below, since criminal charges were not being brought, after Fontane-Medina, Alvarez-Zerquera, and Mirabel-Sainz arrived at the CBP office at the Port of Miami, CBP agents began processing them for administrative immigration proceedings (DE # 94 at 31-32).  Officer Cordero and his partner processed defendant Alvarez-Zerquera after they arrived at the CBP office (DE # 92-93); CBP Officer Miguel Ulloa and his partner processed defendant Fontane-Medina (DE # 88 at 147).

35.   Officer Cordero removed Mr. Alvarez-Zerquera from the holding cell and took him into a large office area, where the CBP officers verified his documents, took fingerprints, and conducted an interview (DE # 88 at 92-93).  As he questioned Mr. Alvarez-Zerquera, Officer Cordero typed the questions and answers into a standard CBP form (DE # 88 at 94-95).  Officer Cordero did not advise Mr. Alvarez-Zerquera of his *Miranda* rights because this was an administrative case and the purpose of the interview was to determine admissibility into the United States (DE # 88 at 96-97).  Some of the questions asked by Officer Cordero were for the purpose of determining whether Mr.

Alvarez-Zerquera committed the crime of alien smuggling because this had a bearing on his admissibility into the United States (DE # 88 at 128-32).  If a permanent resident commits a crime, that can cause him to be subject to administrative removal proceedings and the loss of his residency status (DE # 88 at 140-41).  Once the interview was completed, the form was printed, and it was shown to Mr. Alvarez-Zerquera, who reviewed it and signed it (DE # 88 at 99-100).  Government Exhibit D is a copy of this statement (DE # 101-02).

36.  At the conclusion of the interview, Officer Cordero determined that Alvarez-Zerquera was a lawful permanent resident who was returning to the United States and who was suspected of smuggling people (DE # 88 at 132).  He then transferred this information and custody of Mr. Alvarez-Zerquera to Immigration and Customs Enforcement officers, who are employed by another branch of the Department of Homeland Security (DE # 88 at 132).  The ICE agents arrived after Officer Cordero finished the interview, but before Officer Cordero finished completing his paperwork (DE # 133).

37.  Like Officer Cordero, on July 11, 2011, CBP Officer Ulloa was working the 6:00 a.m. to 2:00 p.m. shift at the seaport.  At the beginning of his shift, Officer Ulloa was told by his supervisor that he was needed to process individuals who had been intercepted by the Coast Guard and were involved in possible alien smuggling (DE # 88 at 147, 158).  Officer Ulloa did not recall whether the traveled to the Coast Guard base, or remained in the office that morning (DE # 88 at 147).  Officer Ulloa, and his partner, Officer Warborton, began processing Mr. Fontane-Medina after he arrived at the CBP office (DE # 88 at 147).   The officers removed Mr. Fontane-Medina from the holding cell, where he had been handcuffed by one hand to the bench (DE # 88 at 157).  They

21

fingerprinted Mr. Fontane-Medina, conducted checks of various computerized systems, and then conducted an interview (DE # 88 at 148).  The checks revealed that Mr. Fontane-Medina was a lawful permanent resident (DE # 88 at 148).  The interview was conducted in the main CBP office at the seaport, and there were various other officers present in the room who were completing unrelated tasks (DE # 88 at 149).  Officer Ulloa did not advise Mr. Fontane-Medina of his *Miranda* rights prior to the interview because it was an administrative interview and he was not being charged criminally (DE # 88 at 151-52).  During the course of the interview, Officer Ulloa asked Mr. Fontane-Medina various questions regarding the two extra passengers who boarded the vessel in the Bahamas, and about how he knew the Captain (DE # 88 at 162-63).  The interview was recorded in the same manner described about with respect to the interview of Mr. Alvarez-Zerquera, and after it was printed, it was provided to Mr. Fontane-Medina, and he signed it (DE # 88 at 152-54, 168, 170-71).  The form containing the interview questions and answers was admitted into evidence as Government Exhibit A.[15]

38.  After the interview, but while Officer Ulloa was still completing the CBP paperwork, ICE agents arrived and told Officer Ulloa that they were going to take Mr. Fontane-Medina with them (DE # 88 at 164-65).

### E.   The Criminal Investigation Conducted by ICE Special Agents

39.  Immigration and Customs Enforcement officers arrived at the CBP offices at about 8:30 a.m. for the purpose of starting a criminal investigation into alien smuggling with respect to the persons on board the Nautigal (DE # 94 at 40).  They did not plan to

---

[15]  There was no specific testimony regarding the interview of defendant Mirabel-Sainz by either CBP officers or ICE agents; the only evidence, which is reflected in these findings of fact, is that all three defendants in this case were processed simultaneously.

arrest the subjects when they arrived, but intended to gather the relevant information and then present it to the U.S. Attorney's Office (DE # 94 at 40-41).  After the three defendants were interviewed and admitted to the fact that they were engaged in smuggling, as described in more detail below, ICE agents consulted with the U.S. Attorney's Office, which authorized the arrests of all three defendants (DE # 94 at 41).

40.  Defendant Fontane-Medina was interviewed by Special Agent Alexander Nader and his partner, Special Agent Daniel Perez (DE # 88 at 188).  At all relevant times, Special Agent Nader was employed by the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") (DE # 88 at 183-84).  They were assigned to the marine investigations group, and responsible for investigating violations of United States Code, Titles 8, 18, 21 and 19 (DE # 88 at 185).

41.  On July 12, 2011, at approximately 8:30 a.m. Agent Nader arrived at the CBP office at the Miami seaport (DE # 88 at 186).  He was told that three individuals had been caught on board a vessel named the Nautigal, along with two others who had no legal right to be in the United States (DE # 88 at 186, 217).  When he arrived, he met with other ICE agents, and they divided their responsibilities regarding the investigation of alien smuggling (DE # 88 at 156, 215).  The investigation included interviewing Fontane-Medina, Alvarez-Zerquera, and Mirabel Sainz, who at that time were located in a holding cell and were handcuffed to benches (DE # 88 at 187).

42.  Agent Nader and his partner, ICE Agent Daniel Perez, removed Mr. Fontane-Medina from the holding cell for the purpose of interviewing him (DE # 88 at 176-77, 188).  When they began the interview, they did not know whether or not Mr. Fontane-Medina had been interviewed previously by CBP agents (DE # 88 at 188).  Agent Perez conducted

the interview in Spanish, and translated what was said to Agent Nader, who does not speak Spanish (DE # 88 at 189). The interview began at 9:00 a.m., when the agents identified themselves, asked Mr. Fontane-Medina for his full name, address, and date of birth, and then advised Mr. Fontane-Medina of his *Miranda* rights (DE # 88 at 206). Mr. Fontane-Medina waived those rights verbally and in writing, and signed the waiver form at 9:05 a.m. (DE # 88 at 188-89). Agent Nader took notes during the interview, which were admitted into evidence as Government Exhibit C (DE # 88 at 189-92, 205-06).[16] The interview lasted approximately between one and one-and-a-half hours, and was completed at about 10:15 a.m. or 10:30 a.m. (DE # 88 at 212, 218). Agent Nader had no further involvement with Mr. Fontane-Medina after that time (DE # 88 at 218).

43. ICE Special Agent Enrique Morales was also involved in this investigation on July 12, 2011 (DE # 88 at 222). Agent Morales arrived at the CBP office at the seaport between 8:30 and 9:00 a.m. that morning (DE # 88 at 222). He and the other agents waited for CBP to finish processing the subjects, and then they interviewed the subjects (DE # 88 at 223-24). Agent Morales and his partner interviewed defendant Alvarez-Zerquera (DE # 88 at 225). Government Exhibit F are his notes of this interview (DE # 88 at 226-27). The interview began at 9:15 a.m., and lasted for approximately one hour (DE # 88 at 227, 230). Once the interview was finished, Mr. Alvarez-Zerquera was returned to the holding cell (DE # 88 at 234).

44. The information from the interviews was provided to the lead agent, Special

---

[16] The only challenge made by Defendant Fontane-Medina with respect to the statements made to ICE agents is based upon the delay in presentment to a Magistrate Judge. He unequivocally stated at the suppression hearing that he is not challenging the waiver of *Miranda* rights, or the voluntariness of the statements made to ICE agents (DE # 88 at 198-99).

Agent Conboy (DE # 88 at 238).  Agent Conboy then had the responsibility for providing all of the information to the United States Attorney's Office, and that Office would determine whether the subjects would be arrested (DE # 88 at 238-39).

45.  The U.S. Attorney's Office authorized the arrests after receiving the relevant information, including the results of the interviews (DE # 94 at 42).  The defendants were then arrested on criminal charges of alien smuggling (DE # 94 at 42).

46.  There is no specific evidence in the record regarding the exact time that the criminal arrests of the defendants occurred, but it was some time after 10:30 a.m., which the evidence reflects was the time that the interviews of defendants Fontane-Medina and Alvarez-Zerquera concluded.  The defendants were then taken to the Federal Detention Center, where they arrived at approximately 12:00 noon.[17]  It takes approximately ten minutes, depending on traffic, to travel from the CBP office to FDC, which is located across the street from the federal courthouse (DE # 88 at 114).

47.  On July 11th, July 12th and July 13th of 2011, initial appearances for defendants charged with crimes were held at 1:30 p.m. before the duty Magistrate Judge. In accordance with the procedures established by the Court, the deadline for bringing those individuals to the cellblock in the courthouse was approximately 11:00 a.m.[18] (DE # 94 at 46-47).

---

[17]  The Government proffered at the hearing, without contradiction, that the Defendants were booked into the Federal Detention Center (which is next to the courthouse) after 11:30, at approximately 12:00 noon on July 12, 2011 (DE # 94 at 87).

[18]  On some occasions, the deadline is extended to 11:30 a.m.

## IV.   LEGAL  ANALYSIS AND CONCLUSIONS OF LAW

### A.   The Questioning of the Defendants While On Board the Nautigal

The parties do not dispute the authority of the Coast Guard to stop and board a United States vessel, such as the Nautigal, and perform a safety and documentation inspection.  *United States v. Warren*, 617 F.2d 1063 (5th Cir. 1980 (en banc).  In addition, it is well settled "that the Coast Guard's routine stop, boarding and inspection of an American vessel on the high seas does not normally rise to the level of custodial detention" and that *Miranda* warning are not required.  *United States v. Rioseco*, 845 F.2d 299 (11th Cir. 1988), citing *United States v. Jonas*, 639 F.2d 200, 204 (5th Cir. 1981); *United States v. Gray*, 659 F.2d 1296 (5th Cir. 1981).  In *Rioseco* the Eleventh Circuit rejected a motion to suppress statements made under circumstances similar to the case at bar.  There, the defendant was convicted of fishing violations under the Lacey Act based upon evidence gathered after the Coast Guard boarded his vessel, including statements the defendant made in response to the initial boarding questions.  The Eleventh Circuit expressly held that the defendant was not in custody at the time of the initial boarding, despite the fact that the members of the Coast Guard boarding party were armed at the time and that the crew of the vessel were gathered in one area of the boat during the initial questioning and search of their vessel.  The restraint on the defendant's movement was characterized as routine procedure as part of a usual boarding action, and could not be characterized as the "degree associated with a formal arrest."  845 F.2d at 303.  Therefore, *Miranda* warnings were not required prior to questioning.

Similarly, in the case at bar, the evidence establishes that the persons on board the Nautigal were not in custody during the time that they were questioned by Coast

Guard Officer Rondon.  The questions asked of defendant Fontane-Medina were routine questions asked during the first fifteen or twenty minutes of the boarding, and the persons on board the Nautigal were permitted to move about the vessel during the boarding.  In fact, one of the persons went below the deck into the cabin to lay down. Although defendant Fontane-Medina challenges the assertion that the questions were asked only during the initial phase of the boarding while the safety and documentation check was occurring, the testimony presented by Officer Rondon in this regard was clear, unequivocal and credible.  During the hearing, counsel for Defendant Fontane-Medina acknowledged that the Coast Guard was not required to provide *Miranda* warnings before asking the initial questions; however, he contended that once the Coast Guard learned from the EPIC check that two of the individuals on board the vessel had no lawful status in the United States, the Defendant was in custody and no further questioning could occur unless preceded by the warnings required by *Miranda*.  The MISLE report reflects that information from EPIC was not received until 9:05 p.m., which was more than thirty minutes after the initial boarding, thus supporting the finding that the initial questioning by Officer Rondon occurred before the results of the check of the EPIC records.[19]

In sum, at the time of the questioning by Officer Rondon, the freedom of movement of the Defendant was not restrained to the degree associated with an arrest; thus, the Defendant was not in custody and *Miranda* warnings were not required prior to questioning.  This was a routine boarding with routine questions asked at the time the

---

[19]  Officer Rondon testified credibly that he had not been advised of this information until much later; however, even assuming that he was advised of the EPIC results as soon as they occurred, it does not alter this analysis since the only questioning of the Defendant was before then.

boarding party came onto the Nautigal.  Therefore, the statements made to Officer Rondon during the initial boarding of the Nautigal are admissible.

        **B.**      **The Questioning by ICE Special Agent Nader**

              **1.**      **Introduction**

A closer question is presented with respect to whether the statements made by the Defendant in response to questioning by Special Agent Nader were taken in violation of the requirement that a defendant be taken without unnecessary delay to the nearest available magistrate judge.  The resolution of this question is complicated by the interrelationship between administrative detentions for the purposes of immigration proceedings and criminal detentions for the purposes of prosecution.  For the reasons stated below, the undersigned finds that the delay in presentment to a United States Magistrate Judge was not unreasonable under the particular facts of this case. Specifically, although the initial period of detention by the Coast Guard was an investigative detention for both criminal and administrative investigation of alien smuggling crimes, the delay in bringing the defendant to shore was based on a decision that he would be processed and detained administratively until an immigration judge decided whether he would be subject to removal from this country based upon administrative charges of alien smuggling.  While he was in administrative detention, defendant Fontane-Medina and his co-defendants were placed in the custody of criminal investigators for the purpose of determining whether criminal charges would be brought.  Following this questioning, and based upon their incriminating statements, the defendants were arrested and charged with criminal alien smuggling offenses. Therefore, although the delay in presentment from the time of the initial Coast Guard boarding at approximately 8:00 p.m. on July 10, 2011, until his presentment at the 1:30

28

p.m. criminal duty calendar on July 13, 2011, was lengthy, the delay was not engineered for the purpose of interrogating the defendant, and it was not unreasonable under the circumstances.  This is not a situation where, absent the criminal investigation, the defendant would have been released.  Moreover, there is no contention that the statements were involuntarily made or that the requirements of *Miranda v. Arizona* were not observed.  Therefore, the statements should not be suppressed.

2.      <u>Framework for Analysis:  The Prompt Presentment Requirement</u>

The requirement that a defendant be presented to a judge as soon as reasonably practical following his arrest is well-established.  The United States Supreme Court has consistently held that even voluntary confessions are inadmissible if given after an unreasonable delay in presentment.  This exclusionary rule was derived from the supervisory power of the Court, and has come to be known as the *McNabb-Mallory* rule, named after the leading cases in which it was applied.  *McNabb v. United States*, 318 U.S. 332 (1943); *Mallory v. United States*, 354 U.S. 449 (1957).  In both *McNabb* and *Mallory*, the Supreme Court held confessions inadmissible where they were obtained during unreasonable presentment delay–in *McNabb* the delay was caused by several days of interrogation; and, in *Mallory* a confession given seven hours after arrest was held inadmissible where the purpose of the delay was to interrogate the defendant, who was at all times "within the vicinity of numerous committing magistrates."  *Mallory*, 354 U.S. at 455.

The prompt presentment requirement announced in *McNabb* and *Mallory* is set forth in Rule 5(a)(1) of the Federal Rules of Criminal Procedure, which was initially promulgated in 1946, and which presently states, "A person making an arrest . . . must

29

take the defendant without unnecessary delay before a magistrate judge."  In 1968,

Congress passed 18 U.S.C. § 3501, which was intended to eliminate the exclusionary

rule of *Miranda v. Arizona* in subsections (a) and (b), and which set forth the

consequences of a violation of the McNabb-Mallory rule in subsection (c).

Specifically, subsection (a) provides that confessions are admissible into

evidence if voluntarily given; and subsection (b) provides a list of factors which should

be considered in determining voluntariness.  These subsections were an attempt by

Congress to overrule the exclusionary rule of *Miranda v. Arizona*, 384 U.S. 436 (1966).

The Supreme Court rejected this attempt to overrule *Miranda* in *Dickerson v. United

States*, 530 U.S. 428 (2000).

Subsection (c) of that statute, which addresses the prompt presentment

requirement, provides:

> (c) In any criminal prosecution . . . a confession made or given
> by a person who is a defendant therein, while such person was
> under arrest or other detention in the custody of any law-
> enforcement officer or law-enforcement agency, shall not be
> inadmissible solely because of delay in bringing such person
> before a magistrate judge . . . if such confession is found by the
> trial judge to have been made voluntarily and if the weight to be
> given the confession is left to the jury and if such confession
> was made or given by such person within six hours
> immediately following his arrest or other detention: *Provided*,
> That the time limitation contained in this subsection shall not
> apply in any case in which the delay in bringing such person
> before such magistrate judge or other officer beyond such six-
> hour period is found by the trial judge to be reasonable
> considering the means of transportation and the distance to be
> traveled to the nearest available such magistrate judge . . . .

In *United States v. Corley*, 556 U.S. 303, 129 S. Ct. 1558 (2009), the Supreme Court

considered whether, despite the language of subsection (c), the *McNabb-Mallory*

exclusionary rule had been wholly eliminated by the language in subsection (a) that

states voluntary confessions are admissible.  In rejecting this contention, the Court

thoroughly reviewed the history and rationale of the prompt presentment requirement.

The Court in *Corley* emphasized that the purpose of this requirement is to prevent secret

detentions and ensure that persons who are detained are advised of the charges on

which they are being held.  *Corley,* 129 S. Ct. at 1562-63, 1570.  As a matter of statutory

construction, and to give effect to all subsections of 3501, the Court held that 3501(a) did

not abrogate the *McNabb-Mallory* rule; and that section 3501(c) was enacted to modify

the *McNabb-Mallory* rule so that it was inapplicable to confessions given within six

hours of arrest.  Thus, the Supreme Court gave the following guidance to district courts:

> Under the rule as revised by § 3501(c), a district court . . . must
> find whether the defendant confessed within six hours of arrest
> (unless a longer delay was "reasonable considering the means
> of transportation and the distance to be traveled to the nearest
> available [magistrate]").  If the confession came within that
> period, it is admissible [as long as it is voluntary]  . . . .  If the
> confession occurred before presentment and beyond six hours,
> however, the court must decide whether delaying that long was
> unreasonable or unnecessary under the *McNabb-Mallory* cases,
> and if it was, the confession is to be suppressed.

129 S. Ct. at 1571.

Based upon the above discussion of *Corley,* the undersigned concludes that the

effect of section 3501 is to provide a six-hour safe harbor period for interrogation, and

that it did not alter the analysis of when delay in presentment beyond those six hours is

unreasonable or unnecessary, thus warranting suppression.  *See United States v.

Clevenger*, No. 11-cr-3518-IEG, 2011 WL 4946599 (S.D. Cal. Oct. 18, 2011) (confession not

suppressed where delay in presentment was not caused by the interrogation, and was

due to administrative delays).

In *United States v. Alvarez-Sanchez*, 511 U.S. 350 (1994), the Supreme Court

provided guidance regarding commencement of the six-hour safe harbor.  There, the defendant was arrested by state authorities on narcotics charges on a Friday evening. At the time of the arrest, the state authorities found counterfeit currency in his residence.  On the following Monday morning, the state authorities notified the Secret Service; and, the Secret Service agents arrived at the police station mid-morning to take possession of the counterfeit currency and interview the defendant.  The defendant confessed and was arrested by the Secret Service.  He was then taken to the Secret Service office for booking, but due to a congested court calendar, he was not presented to the Magistrate Judge until the following day.  The defendant contended that his confession to the Secret Service agents occurred more than six hours after his arrest by state authorities, and since 3501(c) applied whenever a person was under arrest or other detention by any law enforcement officer, his confession must be suppressed.  The Supreme Court squarely rejected this position, holding that "there can be no 'delay' in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place.  Plainly, a duty to present a person to a federal magistrate does not arise until the person been arrested for a *federal* offense."  511 U.S. at 358.  The fact that the arresting officers had reason to believe that the defendant may also have violated federal law was deemed irrelevant, even though the defendant was not prosecuted for the state offenses and had not appeared in state court on the state charges before he was arrested by the Secret Service.  In reaching this result, the Court noted that there was no evidence of collusion between state and federal law enforcement authorities, emphasizing that if state authorities arrested and detained someone for the purpose of allowing federal agents to interrogate him in violation of the right to a prompt federal presentment, the confession

would be suppressed.  511 U.S. at 359-60.

The Eleventh Circuit Court of Appeals reached the same result with respect to civil detention preceding deportation in *United States v. Noel*, 231 F.3d 833 (11th Cir. 2000).  In *Noel*, the defendant had been deported from the United States in 1997. Thereafter, he illegally re-entered the United States, and was convicted of state offenses. While serving his state sentence, the Florida Department of Corrections notified the immigration authorities that Noel was a deportable alien; and, an immigration detainer was lodged against him.  Based upon this detainer, Noel was released into immigration custody to begin deportation proceedings on March 7, 1999.  On March 31, 1999, the immigration authorities confirmed his prior deportation and reinstated his earlier deportation order.  On April 15, 1999, a federal grand jury returned an indictment charging Noel with illegal re-entry following deportation.  He was arrested on April 22, 1999, and appeared before a magistrate judge that same day.  On appeal, defendant Noel contended that these actions violated his right to prompt presentment under Fed. R. Crim. P. 5(a), as well as his right to due process under the Fifth Amendment, and his rights under the Speedy Trial Act.  In rejecting Noel's challenge, the Eleventh Circuit expressly rejected Noel's contention that his speedy trial and prompt presentment rights were triggered by the arrest on March 7th when the immigration officers took him into custody, holding that "detentions attendant to deportation proceedings are civil in nature; they do not implicate Rule 5(a), which only governs criminal arrests."  231 F.3d at 837.  The Court noted, however, that a contrary result might obtain if the detention was used by the government not to effectuate a deportation but as a ruse to detain the

defendant for later criminal prosecution.[20]

With respect to persons detained by the Coast Guard on the high seas, in *United States v. Purvis*, 768 F.2d 1237 (11th Cir. 1985), the Eleventh Circuit has recognized that some delay in transporting defendants to shore was not unreasonable and therefore did not violate the provisions of Fed. R. Crim. P. 5(a), even though the Coast Guard did not proceed directly to shore, but continued its regular patrolling activities for a period of time.  In reaching this result, the Court focused on the facts that the defendants had not been mistreated and that the purpose of the delay was not to conduct interrogations.

Other courts have considered the circumstances surrounding detentions for purposes of immigration determinations that have evolved into arrests on criminal charges during the course of administrative processing.  For example, in *United States v. Garcia-Hernandez*, 569 F.3d 1100 (9th Cir. 2009), the Court found that where an alien was apprehended by border patrol agents at the border, the delay caused by the time required to administratively process an alien due to a shortage of personnel and the number of aliens who needed to be processed, was not unreasonable.  Defendant Garcia-Hernandez had been detained at approximately 4:00 a.m., and the administrative processing did not begin until 5:00 p.m.  Thereafter, at approximately 11:43 p.m., a

---

[20]  Defendant Fontane-Medina's reliance on *United States v. Sotoj-Lopez*, 603 F.2d 789 (9th Cir. 1979) is unavailing.  There, the defendant was arrested for a violation of the Immigration and Nationality Act and assault with a deadly weapon.  The Court rejected the Government's position that the *McNabb-Mallory* rule was not applicable where the person was being held in custody pending a determination of deportability; holding that "an alien who is detained on a criminal charge, or against whom criminal charges are going to be lodged, in addition to any deportation proceedings that may be conducted against him" is not deprived of his right to prompt presentment under Fed. R. Crim. P. 5(a).  In the case at bar, unlike *Sotoj-Lopez*, the defendant was being detained on administrative charges, not criminal charges, when ICE agents began questioning him as part of their criminal investigation.

supervisor reviewed the defendant's file and determined that Garcia-Hernandez was

subject to criminal prosecution.  At that point, officers advised Garcia-Hernandez of his

*Miranda* rights, he waived those rights, and gave an incriminating statement.  The

defendant was brought before a magistrate judge the following day.  In determining that

the delay was not unreasonable, the Court emphasized:

> The *McNabb–Mallory* rule was designed to deter police from engaging in lengthy prearrignment detentions for the purpose of further interrogating a defendant.  Accordingly, a delay is unreasonable and unnecessary when it is "of a nature to give opportunity for the extraction of a confession." *Mallory*, 354 U.S. at 455, 77 S. Ct. 1356.  We have been careful not to overextend *McNabb–Mallory's* prophylactic rule in cases where there was a reasonable delay unrelated to any prolonged interrogation of the arrestee.  In particular, we have held that administrative delays due to the unavailability of government personnel and judges necessary to completing the arraignment process are reasonable and necessary and therefore do not violate the prompt-presentment requirement of Rule 5(a).  *See, e.g., United States v. Gamez*, 301 F.3d 1138, 1143 (9th Cir. 2002) (holding that a day-and-a-half delay was reasonable due to the unavailability of Spanish-speaking federal agents); *Van Poyck*, 77 F.3d at 289 (holding that a defendant's statements "fall[ing] outside § 3501(c)'s 'safe harbor' " were nonetheless admissible because the weekend delay due to the lack of an available magistrate was "reasonable" under the circumstances).
>
> Here, the district court found the delay in Garcia's presentment was caused not by a desire to interrogate Garcia further but by a shortage of personnel necessary to process Garcia and determine whether he should be criminally charged.  . . . Because we agree with the district court that the delay in presentment occasioned by the officers' heavy caseload was reasonable and necessary under the circumstances, we conclude that the district court did not err in denying Garcia's motion to suppress his confession.

569 F.3d at 1106.  *See also United States v. Tejada*, 255 F.3d 1 (1st Cir. 2001)

(administrative detention of person attempting to enter United States to investigate

legality of his entry did not trigger prompt presentment requirement of Rule 5(a)).

In *United States v. Brown*, 459 F.2d 319 (5th Cir. 1971), the Court held that the burden of proving a violation of Rule 5(a) is on the defendant.

### 3. Analysis of the Prompt Presentment Requirement in the Case at Bar

Based upon the foregoing authorities, in the case at bar, the first step is to determine whether the confession came within six hours of arrest. The Government concedes that it did not, although the parties dispute when the period of detention began. The Government contends that it began when the Defendant was transferred from the Nautigal to the Coast Guard cutter Sitkinak (DE # 94 at 68-70); whereas the Defendant apparently contends that the relevant time began when the Coast Guard boarded the Nautigal, following the initial boarding questions (DE # 59 at 3-4).

The parties also dispute whether, after six hours, the only permissible delay is a delay caused by the means of transportation and distance to be traveled to the nearest available magistrate judge; or whether the Court can consider the totality of the circumstances in determining whether the delay was reasonable. The Defendant contends that the Nautigal was intercepted when it was approximately 18 miles offshore, and that the defendant could have been brought to shore within one hour after he was detained on July 10, 2011. Since the criminal duty calendar for Miami Magistrate Court on Monday, July 11, 2011, was at 1:30 p.m., the Defendant contends that he should have appeared at that time; that the further delay was unreasonable; and, therefore any statements he made after this time should be suppressed. Supporting the argument that the questioning by CBP and ICE agents deprived the Defendant of his right to prompt presentment, the Defendant also argues that, even assuming it was permissible to delay his return to Miami until the morning of July 12, 2011, he should have been promptly

presented to the Magistrate Judge at the 1:30 p.m. calendar that day; and, that the questioning which occurred after his arrival resulted in further unnecessary and unreasonable delay.  The Government, on the other hand, contends that the delay was caused by the need to make a determination regarding the Defendant's admissibility into the United States, and that the delay in processing the Defendant was due to the lack of manpower of CBP until the morning of July 12th.  In addition, the Government asserts that the detention of the Defendant after he arrived at the Customs office was administrative only, and that he could not have been presented to a Magistrate Judge because criminal prosecution had not been authorized by the U.S. Attorney's Office, and there was no criminal charge as to which he could have been presented until after the questioning by Special Agent Nader.  Thus, the Government contends that the confession at issue did not cause any delay in presentment, and therefore it should not be suppressed.

At the outset, the undersigned agrees with the Government that the determination of whether a confession must be suppressed due to an unreasonable or unnecessary delay in presentment to a magistrate judge is made by looking at the totality of the circumstances, rather than by looking only at delays incident to transportation.  Section 3501(c) modified the *McNabb-Mallory* rule by prohibiting suppression of statements made within six hours of detention, regardless of whether the delay was unreasonable; and also requires the Court to take into account transportation delays when determining whether delay beyond six hours is reasonable.  The statute, however, does not mandate suppression in all other instances; and as implicitly recognized in *Corley*, the court must

evaluate the reasonableness of such further delay under the *McNabb-Mallory* rule.[21]

In the case at bar, the steps that were taken by the civil and criminal law enforcement agencies were reasonable, considering the tasks that needed to be performed and the decisions that needed to be made, in order to process the defendant and the others on board the Nautigal, with respect to their entry into the United States. When faced with a group of persons, some of whom appeared to be legal permanent residents with appropriate documentation, and others who claimed to be legal permanent residents but who did not have the appropriate documentation, the Coast Guard acted reasonably in determining that CBP needed to be advised of the situation and that further investigation was necessary before any of those on board could be permitted to enter the United States. Based upon the suspicion of alien smuggling, the Coast Guard acted properly when it refused to permit any of the aliens to go on their way in the Nautigal. Moreover, although defendant Fontane-Medina, as well as Alvarez-Zerquera and Mirabel-Sainz appeared to have appropriate documentation, it was reasonable under the circumstances to investigate further through the use of databases and biometrics, and to transfer all five persons to the Sitkinak for that purpose. At approximately 3:30 a.m. on July 11th, seven-and-a-half hours after the Nautigal had been intercepted, the results of the biometrics confirmed the identity of Fontane-Medina, Alvarez-Zerquera, and Mirabel-Sainz, and that there was no derogatory information regarding their status. By this time, the other two aliens on board the vessel had admitted that they were Cuban migrants, and one of them, Ms. Crespo Diaz, had

---

[21] In *Corley*, the Supreme Court remanded the case for consideration of whether the delay beyond six hours was reasonable; there were no transportation issues involved since the statement, which was taken more than six hours after detention, was taken in the same building that housed the magistrate judge.

38

admitted they paid $500 to be brought from Bimini to the United States.

Under standard procedures, the Coast Guard held all five persons in Coast Guard custody at sea until a conference call could be held by members of the RCT.  Therefore, since the Sitkinak needed to return to its base in Miami due to crew fatigue and maintenance issues, all five persons from the Nautigal were transferred to the Coast Guard cutter Drummond at approximately 8:00 a.m. on July 11th.  This was approximately 12 hours after the initial boarding.  The conference call was scheduled to occur at 1:00 p.m., which was approximately 17 hours after the initial boarding.  The undersigned finds and concludes that the use of an RCT conference call by the Government to determine how to proceed with respect to persons intercepted at sea en route to the United States was reasonable and appropriate.  Moreover, due to the need to contact the appropriate supervisory personnel of various agencies, and for them to obtain all of the relevant information, it was reasonable to arrange the call to occur at 1:00 p.m.

The unrefuted evidence establishes that the RCT decided that the two Cuban aliens with no status would be repatriated to the Bahamas and not permitted to enter the United States.  In addition, the other three persons would be taken into administrative custody to determine whether their residency status should be revoked based upon their involvement in alien smuggling.  Based upon the decision that a criminal prosecution would not be authorized at that time, the time required for administrative processing, and the unavailability of border patrol agents to conduct that processing on July 11th due to the heavy influx of cruise ship passengers that day, the Coast Guard was directed to hold Fontane-Medina, Alvarez-Zerquera, and Mirabel-Sainz until the following morning.  Although it is a close question, the undersigned finds that under the

circumstances, this was a reasonable decision, which did not violate the prompt presentment requirement of Rule 5(a) since at that time no immediate criminal prosecution was envisioned.

On July 12, 2011, at 7:00 a.m., approximately 36 hours after the Nautigal was intercepted, Fontane-Medina, Alvarez-Zerquera, and Mirabel-Sainz arrived on shore and were transferred from the Coast Guard into the custody of CBP.  They were then brought to the CBP office where the administrative process, including administrative questioning began.  At approximately 8:30 a.m., while defendant Fontane-Medina and his co-defendants were undergoing administrative processing, ICE agents arrived for the purpose of questioning them.  At 9:00 a.m., approximately 37 hours after the interception of the Nautigal, and 34 hours after the transfer to the Sitkinak, Special Agent Nader removed Mr. Fontane-Medina from his holding cell, advised him of his *Miranda* rights and, following Mr. Fontane-Medina's waiver of those rights, questioned him until approximately 10:15 or 10:30.  At the same time, other agents questioned Mr. Alvarez-Zerquera.  Thereafter, the case agent advised the U.S. Attorney's Office of the results of the interviews, and a criminal prosecution was authorized.  Based upon this authorization, the defendants were placed under criminal arrest, and transported to the Federal Detention Center ("FDC"), where they arrived at approximately 12:00 p.m.  The Court in this District in Miami has established a policy that all defendants who can be brought to the cellblock in the courthouse (which is across the street from FDC)  by 11:00 a.m. will appear on the 1:30 p.m. Magistrate Court calendar; if they cannot arrive by that time, the defendants are booked into FDC and make their initial appearance in

Court on the following day.[22]

Based upon the circumstances of this case, including the fact that the aliens who are the basis for the criminal charges were not being brought into this country as material witnesses, the undersigned finds that it was reasonable for the Government to proceed as it did with administrative processing; and, then to make a determination after the defendants were interviewed by ICE agents and made incriminating statements, that criminal charges would be brought.  There is nothing that precludes criminal investigators from interviewing persons who are being held in administrative detention; and, therefore it was reasonable for Agent Nader to do so.  Moreover, once the decision was made that a criminal prosecution would ensue, the remainder of the delay was due to court procedures and the availability of a Magistrate Judge, and no statements were taken during that period of time.

Thus, although the delay in presentment to a Magistrate Judge was significant when measured from either the time the Nautigal was boarded or the time the Defendant was taken on board the Sitkinak, the delay was not for the purpose of permitting an interrogation of the defendant, nor any other improper purpose.  The questioning that occurred followed a valid waiver of *Miranda* rights, was brief, lasting only between one and one-and-a-half hours, and was not done in a threatening or coercive manner.

The undersigned recognizes that criminal law enforcement agents were kept abreast of developments at least as early as 10:20 p.m. on July 10th, and had some involvement in the investigation at that time, as evidenced by the fact that ICE Supervisor Hammer had requested that biometrics be conducted on all five persons on

---

[22]  This procedure was recently recognized in another decision of this Court in *United States v. Thompson*, No. 10-20410, 2011 WL 4055400 (S.D. Fla. Sept. 13, 2011).

41

board the Nautigal.  However, it is also clear that a decision was made at the RCT conference call on July 11th at 1:30 p.m. that the defendants would be processed administratively with respect to their own immigration status, rather than charged criminally at that time.  Based upon the early involvement of criminal investigators, and the concession of the Government, the undersigned has assumed that the triggering event for purposes of Rule 5(a) occurred, at the latest, when defendant Fontane-Medina and the others were transferred to the Sitkinak.[23]  However, the undersigned also recognizes that if the administrative process had been allowed to run its course, and the defendants had been booked into immigration custody, under *Alvarez-Sanchez* and *Noel*, there would have been no violation of the prompt presentment requirement of Rule 5(a).  Therefore, based upon the finding that the administrative detention was not a ruse and was not undertaken for the purpose of gaining any tactical advantage or for the purpose of obtaining a confession, the undersigned concludes, under the particular circumstances of the case at bar, that the delay was reasonable.[24]  Once a criminal prosecution was authorized, there was no additional interrogation and the defendants were presented to a United States Magistrate Judge at the next available calendar.

---

[23]  For purposes of this case, the additional three-hour delay claimed by the Defendant that occurred while he remained on the Nautigal does not alter the analysis.

[24]  The finding that this was not a ruse is supported by the email sent by Chief Boswell prior to the RCT conference call, in which he gave the times he recommended for bringing the aliens ashore, and in which he stated he doubted that the subjects were going to be charged criminally (GX G).  The result of this Motion would likely have been different if the defendants had been held for criminal prosecution after the RCT conference call.  Moreover, the undersigned notes that this is not a situation where the persons detained were United States citizens rather than returning resident aliens subject to deportation or removal proceedings, which supports the finding that the delay occasioned by administrative processing was reasonable.

## V.    CONCLUSION

Based upon the above Findings of Fact and Conclusions of Law, the undersigned finds and concludes that the Defendant was not in custody during the time he was questioned by the Coast Guard boarding officer on the Nautigal, and therefore *Miranda* warnings were not required.  In addition, the delay in his presentment to a magistrate judge was reasonable under the particular circumstances of this case, and did not violate Fed. R. Crim. P. 5(a).  Therefore, it is hereby

**RECOMMENDED** that Defendant's Motion To Suppress Statements  (DE # 23), be **DENIED**.

The parties shall have 14 days from the date of service of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable Patricia A. Seitz, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. *Resolution Trust Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988).

**DONE AND SUBMITTED** in chambers in Miami, Florida on November 27, 2011.


*Andrea M. Simonton*
_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished via CM/ECF to:
The Honorable Patricia A. Seitz, United States District Judge
All counsel of record